AFFIRMED; Opinion Filed November 27, 2012.



In The

## Court of Appeals

## Fifth District of Texas at Dallas

No. 05-10-01486-CV

EMILIO OLIVARES, Appellant

V.

ALFONSO MARES AND MULTI-BUILDING, INC., Appellees

On Appeal from the County Court at Law No. 3
Dallas County, Texas
Trial Court Cause No. CC-06-01800-C

# OPINION

Before Justices Bridges, Richter, and Lang
Opinion By Justice Lang

Appellant Emilio Olivares filed suit against appellees Alfonso Mares[1] and Multi-Building,

Inc. ("Multi-Building") based on injuries suffered by Olivares while working on the construction of

an apartment complex (the "project"). Following a jury trial, the trial court rendered judgment that

Olivares recover $61,225 from Multi-Building and $146,940 from Mares, plus interest and a

percentage of court costs.

In four issues on appeal, Olivares asserts the trial court reversibly erred by (1) excluding from

evidence a written subcontract (the "subcontract") between Multi-Building and the project's general

---

[1] No brief has been filed by Mares in this Court.

contractor, Limestone Construction SW Bluffs, L.C. ("Limestone"); (2) "forcing" a jury submission on a premises condition liability theory when Olivares was seeking only a negligent activity submission; (3) failing to include Multi-Building in the negligent activity question submitted to the jury; and (4) reducing the jury's award of past lost income on Multi-Building's motion for judgment notwithstanding the verdict when there was some evidence to support the amount awarded by the jury. Additionally, Multi-Building asserts two "cross-points" in which it contends that if the trial court's reduction of the jury's award of past lost wages was error, (1) the trial court erred by not granting judgment notwithstanding the verdict "that [Olivares] take nothing on his claims against Multi-Building" and (2) the evidence was legally and factually insufficient to support an award of past lost wages to Olivares. We decide Olivares's four issues against him. Further, we decide against Multi-Building on its two "cross-points." The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In his live petition at the time of trial, Olivares stated that at the time he was injured, he was a "worker for one or more of [d]efendants."[2] Olivares asserted that while on the job site of the project (the "premises") during the course and scope of his employment, he was directed by his supervisor to obtain a joist[3] for installation. Olivares stated that in doing so, he "was required to step atop of each joist of the second floor, stepping on each one, in order to traverse across the second floor of the apartment complex." According to Olivares, "[t]his method and manner of traversing the second floor was of common knowledge to all employees of [Mares] as well as [Multi-

---

[2] In addition to Multi-Building and Mares, the defendants named in this case included Limestone; Limestone Group SW Bluffs, L.C.; and Bluffs at Vista Ridge, Ltd. This Court dismissed all defendants other than Multi-Building and Mares from this appeal.

[3] During trial, Olivares testified the "joists" with which he was working were wooden beams of varying length, eighteen or twenty-four inches wide and four inches thick, that were being installed in the ceiling of the building's first story to support the floor of the second story. The parties dispute the proper designation for the beams with which Olivares was working. For purposes of this opinion, we refer to them as "joists."

Building]." Olivares contended that as he was stepping on a joist that "had not been properly braced, banded or properly secured," the joist "toppled over," causing him to fall on his side. He stated that as a result of his fall, he "suffered extensive medical injuries to his back, chest, arms, and body in general." Olivares asserted claims for, *inter alia*, negligence and premises liability.

In his negligence claim, Olivares contended in part that the incident in question "occurred at the job site being managed and controlled by [d]efendants." According to Olivares, "[d]efendants were careless in their management of the job site and failed to maintain a safe working environment for their employees/servants/agents, including [Olivares]." Specifically, Olivares stated

> [Multi-Building] was contracted by [Limestone] to provide "labor and services" for the installation of joists and trusses. The contractual provisions between [Limestone], as the general contractor and [Multi-Building], as the subcontractor, provided not only that [Multi-Building] would provide labor and services for the installation of joists and trusses but also comply with all safety regulations, provide safety railings, provide OSHA approved equipment, provide a Safety Coordinator, and to comply with all other OSHA rules and regulations on all aspects of the work to be performed, which [Multi-Building] failed to do. Nor did Defendant properly brace the joists and trusses as required by local governing ordinances, plans and specifications of the joist and truss manufacturers.

In his premises liability claim, Olivares stated in part

> All [d]efendants had management and control of these premises in order to perform both general and sub-contract work. As the general contractor, [Limestone] managed and controlled the premises in order to construct a new apartment complex on behalf of [the general partner and the premises owner]. In turn, [Limestone] contracted with [Multi-Building] to install joists and trusses for the construction project. As such [Multi-Building] had control and maintained the premises where the joists and trusses were being installed.

Further, Olivares contended in part that Multi-Building proximately caused Olivares's injuries by "failing to warn [Olivares] a dangerous condition existed, which required extra care to be taken."

Multi-Building and Mares filed separate general denial answers and asserted various affirmative defenses. Multi-Building's affirmative defenses included, in part, (1) Olivares's injuries

were caused, in whole or in part, by the negligence of Mares, over whom Multi-Building had "no right of or actual control"; and (2) Multi-Building owed no "legal duty" to Olivares. Further, Multi-Building asserted several cross-claims against Mares, whom Multi-Building described as "the employer of [Olivares]."

Additionally, Multi-Building filed a pretrial motion in limine in which it requested, in part, that all counsel and witnesses be instructed to refrain from making any "mention or interrogation" concerning the subcontract or any breach thereof. Multi-Building asserted in part that "Mares (and therefore [Olivares]) were not parties to the [subcontract], and the [subcontract] has no relevancy to the duties and responsibilities of Multi-Building to Mares and/or Olivares." Also, Multi-Building contended the subcontract "would be cumulative and would confuse the jury and unfairly prejudice [Multi-Building]." During argument on Multi-Building's motion in limine, counsel for Olivares asserted the subcontract showed Multi-Building "contractually bound themselves to provide a safe place to work" and "contractually bound themselves to not sublet the work." Thus, according to counsel for Olivares, the subcontract showed Multi-Building "had a duty to provide a safe place to work." After some discussion, the trial court asked whether Olivares had pleaded "third party beneficiary" as to the subcontract, and counsel for Olivares stated he had not. The trial court granted Multi-Building's motion in limine as to the subcontract.

During trial, Samuel Mark LeComte, an owner of Multi-Building, testified in part that Multi-Building hired Mares as a subcontractor to perform work on the project. LeComte stated there was no written contract between Multi-Building and Mares pertaining to the project. Additionally, LeComte testified Multi-Building was not Olivares's employer.

Thomas Littrell, an expert designated by Olivares, testified in part that in his opinion, the party "responsible for overseeing safety at the jobsite" was Multi-Building.

Olivares testified that at the time he was injured, he was working for Mares as a carpenter's helper. Olivares stated the incident in question occurred as follows:

> We were working at the corner of the building that was being built. And Santos, my foreman, asked me to bring a joist that was some distance away. So I went walking on top of the joists to be able to get it and bring it to him, and I brought several to him that way.
>
> Well, and what happened, I was going, and the last one either wasn't nailed down or wasn't firm. And I stepped on it, and it turned, and I fell on top of it.

As to past lost wages, Olivares testified he was paid $300 per week for his work at the job site and he missed 240 weeks of work as a result of his injuries. Thus, according to Olivares, his past lost wages totaled $72,000. Additionally, Olivares testified on cross-examination as follows:

> Q. [by counsel for Multi-Building] Mr. Olivares, do you remember your earlier testimony that, doing the math with what you're making, that you believe you were out in lost wages $72,000?
>
> A. Yes.
>
> Q. Can you tell the jury how much that you are currently making selling clothes?
>
> A. There's not a fixed amount. It varies suddenly.
>
> Q. Would you agree that it's sometimes 600 per week and sometimes a thousand?
>
> A. Pesos.
> . . . .
> Q. Would you agree that you are making about 40 percent of the income that you had made in the past?
>
> A. More or less.

Following Olivares's testimony, counsel for Olivares offered into evidence excerpts from the deposition testimony of William Whitford III, who worked as a superintendent for Multi-Building. Counsel for Multi-Building objected to the admission of certain portions of Whitford's deposition testimony on the ground that such testimony referred to the subcontract. The trial court sustained Multi-Building's objection. Outside the presence of the jury, counsel for Olivares made an offer of

–5–

proof respecting the excluded testimony. The subcontract was proffered by Olivares as part of that offer of proof.

Later in the trial, during the testimony of an expert witness for Multi-Building, counsel for Olivares again objected to the trial court not allowing the subcontract into evidence. Counsel for Olivares argued, in part, "[B]y not allowing the jury to see that the ultimate responsibility was with Multi-Building, we feel that we were prevented from adequately presenting our case to the jury as far as what responsibility contractually Multi-Building had to provide a safe working environment and that they were not to sublet the actual work that was being performed by Mr. Mares and, of course, ultimately Mr. Olivares, which caused his injury." Counsel for Multi-Building responded that the subcontract was not relevant because "[i]t only deals with the contractual duties between Limestone and Multi-Building" and "whatever contractual duties back and forth to them, Limestone and Multi-Building don't affect the agreement and duties between Multi-Building and the subcontractor that they hired to do the work." The trial court overruled Olivares's objection, and counsel for Olivares then "renew[ed]" his offer of proof described above.

At the charge conference, counsel for Olivares asserted, in part, that he had "never presented this case as premises liability" and did not want to "provide a jury charge regarding premises liability." Later during the charge conference, counsel for Olivares stated he was "willing to pursue—to submit to the jury a premises liability claim." The trial court charged the jury on "straight negligence" and premises liability theories with respect to Mares, but included only premises liability definitions and questions as to Multi-Building. Counsel for Olivares objected to the omission from the charge of instructions, definitions and questions proposed by him pertaining to his claims against Multi-Building for "straight negligence." Those objections were overruled by the trial court.

After the jury returned a verdict,[4] Multi-Building moved for judgment notwithstanding the

[4] The jury responded as follows to the questions in the charge of the court:

**QUESTION 1:**

Did any of the following exercise or retain some control over the manner in which the injury causing activity was performed, other than the right to order the work to start or stop or inspect progress or receive reports?
Answer "Yes" or "No" for each of the following:

| | |
|---|---|
| a. Multi-Building, Inc. | Yes |
| b. Alfonso Mares | Yes |

If you answered Question No. 1 "no" as to either party, then do not answer Question 2 as to that party.

**QUESTION 2.**

Did the negligence of any of the following proximately cause the occurrence in question?

With respect to the condition of the premises, Alfonso Mares was negligent if:
a. the condition posed an unreasonable risk of harm, and
b. he knew or reasonably should have known of the danger, and
c. failed to exercise ordinary care to protect Emilio Olivares from the danger, by failing to adequately warn Emilio Olivares of the condition and failing to make that condition reasonably safe.

With respect to the condition of the premises, Multi-Building, Inc., was negligent if:
a. the condition posed an unreasonable risk of harm, and
b. it knew or reasonably should have known of the danger, and
c. failed to exercise ordinary care to protect Emilio Olivares from the danger, by failing to adequately warn Emilio Olivares of the condition and failing to make that condition reasonably safe.

**"Ordinary Care,"** when used with respect to the conduct of Alfonso Mares and/or Multi-Building, Inc. as an owner or occupier of the premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.
Answer "Yes" or "No"

| | |
|---|---|
| a. Alfonso Mares | Yes |
| b. Multi-Building, Inc. | Yes |
| c. Emilio Olivares | Yes |

If you answered "Yes" to Question 1 or 2 for more than one of those named above, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 3.**

What percentage of the negligence that caused the occurrence do you find to be attributable to each of those listed below and found by you, in your answer to Question 2, to have been negligent?

The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The negligence attributable to any one named below is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

| | | |
|---|---|---|
| a. Multi-Building, Inc.: | | 25% |
| b. Alfonso Mares: | | 60% |
| c. Emilio Olivares: | | 15% |
| | TOTAL | 100% |

**QUESTION 4.**

Did the negligence, if any, of those named below proximately cause the occurrence or injury in question? Answer "Yes" or "No" for each of the following:

**"Ordinary Care,"** when used with respect to the conduct of Alfonso Mares as an occupier of a premises, means that degree of care that would be used by an occupier of ordinary prudence under the same or similar circumstances.

**"Negligence,"** when used with respect to the conduct of Alfonso Mares, means failure to use ordinary care, that is, failing to

verdict. In its motion, Multi-Building (1) requested that the trial court "disregard the jury's answer to question numbers 1 and 2 with respect to Multi-Building so that [Olivares] takes nothing from Multi-Building" because there was no evidence to support the jury's findings as to those questions

---

do that which a person or entity of ordinary prudence would have done under the same or similar circumstances or doing that which a person or entity of ordinary prudence would not have done under the same or similar circumstances.

a. Alfonso Mares      Yes
b. Emilio Olivares      Yes

**QUESTION 5.**

What percentage of the negligence that caused the occurrence do you find to be attributable to each of those listed below and found by you, in your answer to Question 2, to have been negligent?

The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The negligence attributable to any one named below is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

A. Alfonso Mares      80%
b. Emilio Olivares      20%
         TOTAL   100%

**QUESTION 6.**

What sum of money, if paid now in cash, would fairly and reasonably compensate EMILIO OLIVARES for his injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

Do not reduce the amounts, if any, in your answers because of the negligence, if any, of EMILIO OLIVARES. Answer separately, in dollars and cents, for damages, if any. Do not include any amount for any condition not resulting from the occurrence in question. Do not include any amount for any condition existing before the occurrence in question, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the occurrence in question.

a.      Physical pain and mental anguish sustained in the past.
     Answer: $40,000.00

b.      Physical pain and mental anguish that, in reasonable probability, will be sustained in the future.
     Answer: $10,000.00

c.      Reasonable expenses of medical care in the past.
     Answer: $122,900.00

d.      Loss of wages sustained in the past.
     Answer: $70,000.00

e.      Impairment sustained in the past.
     Answer: $15,000.00

f.      Impairment that, in reasonable probability, will be sustained in the future.
     Answer: $10,000.00

g.      Disfigurement sustained in the past.
     Answer: $5,000.00

h.      Disfigurement that, in reasonable probability, will be sustained in the future.
     Answer:     -0-

and (2) asserted "the jury's finding of $70,000 for past lost wages should be reduced to $42,000 (60% of $70,000)" because the uncontradicted testimony was that Olivares was making forty percent of the income that he claimed he had lost as a result of the accident. Olivares filed a response to Multi-Building's motion in which he stated in part

> When asked if he "[w]ould ... agree that" he is "making about 40 percent of the income that" he "had made in the past," Plaintiff answered, "More or less." However, that calculation is clearly a mistake because 600 pesos per week is only $41.32, and 1,000 pesos is $68.87 in the United States. Since $68.87 is only 23.0% of $300.00 and $41.32 is only 13.8% of $300.00, there is insufficient credible evidence for this Court to reduce the jury's award of past lost wages by 40.0%. Accordingly, if this Court reduces the $72,000.00 awarded by the jury for Plaintiff's past lost wages by any sum, it should be by no more than 18.4%, which is the average of 23.0% and 13.8%.

(citations to record and exhibit omitted). After a hearing, the trial court granted Multi-Building's motion for judgment notwithstanding the verdict as to the reduction of past lost wages to $42,000.

Following the trial court's rendering of the judgment described above, this appeal was timely filed.

## II. APPELLANT'S ISSUES

### A. Standard of Review

We review a trial court's admission or exclusion of evidence under an abuse of discretion standard. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). Likewise, an abuse of discretion standard is applied to review of claimed error in the jury charge. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion by failing to follow guiding rules and principles. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)); *see Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

We review a party's challenge to the trial court's grant or denial of a motion for judgment notwithstanding the verdict under a legal sufficiency standard. *Holland v. Lovelace*, 352 S.W.3d 777, 795 (Tex. App.—Dallas 2011, pet. denied). We review the evidence in the light most favorable to the jury's findings, considering only the evidence and inferences that support them and disregarding all evidence and inferences to the contrary. *Mewhinney v. London Wineman, Inc.*, 339 S.W.3d 177, 180 (Tex. App.—Dallas 2011, pet. denied). If there is more than a scintilla of evidence to support the jury's findings, the motion for judgment notwithstanding the verdict was properly denied. *Id.*

Additionally, pursuant to Texas Rule of Appellate Procedure 44.1(a), no judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes the error complained of "probably caused the rendition of an improper judgment; or . . . probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a). The Texas Supreme Court has stated that it "recognize[s] the impossibility of prescribing a specific test to determine whether a particular error is harmful" and "entrust[s] that determination to the sound discretion of the reviewing court." *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. In making such a determination, the court must review the entire record. *Id.* (citing *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989); *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 821 (Tex. 1980)). The exclusion or admission of evidence is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870 (citing *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008)). But if erroneously admitted or excluded evidence was crucial to a key issue, the error is likely harmful. *Id.*; *see Boulle v. Boulle*, 254 S.W.3d 701, 708 (Tex. App.—Dallas 2008, no pet.) ("A trial court's error in

excluding evidence requires reversal if the evidence 'is both controlling on a material issue and not cumulative.'" (quoting *Mentis v. Barnard*, 870 S.W.2d 14, 16 (Tex. 1994)).

### B. Applicable Law

In order to warrant submission to the jury, an issue must be raised by both the pleadings and the evidence. *See* TEX. R. CIV. P. 278. A trial court may refuse to submit a question if there is no evidence in the record to warrant its submission. *See Park N. Serv. Ctr., L.P. v. Applied Circuit Tech., Inc.*, 338 S.W.3d 719, 721 (Tex. App.—Dallas 2011, no pet.) (citing *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992)).

The supreme court has explained the difference between liability for negligent activity and liability for failing to remedy an unreasonable risk of harm due to the condition of premises as follows:

> "Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." Negligence in the former context means simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done. Negligence in the latter context means "failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about."

*Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) (footnote citations omitted) (quoting *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264, 267 (Tex. 1992)). If an injury was caused by a condition created by an activity rather than the activity itself, a plaintiff is limited to a premises liability theory of recovery. *Crooks v. Moses*, 138 S.W.3d 629, 639 (Tex. App.—Dallas 2004, no pet.) (citing *Lucas v. Titus Cnty. Hosp. Dist./Titus Cnty. Mem'l Hosp.*, 964 S.W.2d 144, 153 (Tex. App.—Texarkana 1998, pet. denied)).

An owner or occupier of land has a duty to use reasonable care to keep the premises under his control in a safe condition. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985). In the

–11–

context of premises liability, a general contractor on a construction site, who is in control of the premises, is charged with the same duty as an owner or occupier. *Id.* With respect to existing defects, an owner or occupier has a duty to inspect the premises and warn of concealed hazards the owner knows or should have known about. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 295 (Tex. 2004). With respect to defects arising later, an owner has no duty unless it retains a right to control the work that created the defect. *Id.*

Pursuant to Texas Rule of Appellate Procedure 33.1(a), as a prerequisite to presenting a complaint for appellate review, the record must show the complaint was made to the trial court by a timely request, objection, or motion that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a).

### C. Analysis

#### 1. Jury Charge Error

We begin with Olivares's second and third issues, which we address together. In those issues, Olivares contends the trial court reversibly erred by (1) "forcing" a jury submission on a premises condition liability theory when Olivares "was seeking only a negligent activity submission" and (2) "failing to include Multi-Building in the negligent activity question submitted to the jury."

Multi-Building responds, in part, that "[b]ecause [Olivares] was injured as a result of a condition created by an activity, and not as a contemporaneous result of a negligent activity itself," the trial court's submission to the jury was proper.

In his brief in this Court, Olivares asserts the evidence showed Multi-Building "failed to instruct [Olivares] as to the proper and safe way of maneuvering when there were joists present." Therefore, Olivares argues, a "straight negligence" submission as to Multi-Building was warranted

–12–

and a premises liability submission was not warranted. However, the record shows Olivares alleged in his live petition that his injury occurred when he stepped on a joist that "had not been properly braced, banded or properly secured" and the joist "toppled over," causing him to fall on his side. Additionally, Olivares testified at trial, in part, "Well, and what happened, I was going, and the last [joist] either wasn't nailed down or wasn't firm. And I stepped on it, and it turned, and I fell on top of it."

"Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." *Timberwalk*, 972 S.W.2d at 753 (quoting *Keetch*, 845 S.W.2d at 264). Negligence in the latter context means "failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about." *Id.*

In *Timberwalk*, an apartment tenant, Tammy Rene Cain, was raped in her apartment by an intruder, Peter Saenz. *Id.* at 751. Cain sued the owners of the apartment complex, alleging they negligently failed to provide adequate security. *Id.* The jury found Cain's injuries were caused only by her own negligence, and the trial court rendered judgment on the verdict for defendants. *Id.* at 752. The court of appeals reversed and remanded for a new trial, holding in part that the trial court erred in defining negligence with respect to defendants as in a premises liability case. *Id.* In an appeal to the supreme court, the defendants contended the trial court "did not err in charging the jury as on a premises liability claim rather than a negligent activity claim." *Id.* at 753. The supreme court agreed, reasoning as follows:

> Cain does not assert that she was injured by or as a contemporaneous result of any activity of defendants. The only activity that injured Cain was Saenz's. Rather, Cain asserts that defendants' failure to provide adequate security measures created an unreasonable risk of harm that defendants knew or should have known about and yet

–13–

failed to correct. This is a premises liability claim on which the district court correctly charged the jury. The court properly refused Cain's request to charge the jury as in a negligent activity case.

*Id.; see also Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997) (where employee of independent contractor at oil and gas drilling site slipped while on catwalk and was injured when he landed on equipment left on ground, case was "premises defect case" rather than negligent activity case); *Keetch*, 845 S.W.2d at 264 (trial court "properly did not submit a negligent activity theory of liability" where grocery store customer who slipped and fell was injured by condition created by store's spraying of chemical thirty minutes prior to customer's fall and was not injured by "activity of spraying"); *Lucas*, 964 S.W.2d at 153 (premises liability submission was proper because cause of action was based upon plaintiff being injured by condition created when hospital negligently put broken chair in waiting room and not by hospital's activity when putting chair in room); *Stanley Stores, Inc. v. Veazey*, 838 S.W.2d 884, 886 (Tex. App.—Beaumont 1992, writ denied) (evidence in record did not support "simple negligence" theory of liability where cup of liquid that apparently caused supermarket customer to slip and fall came from soft drink promotional activity in another area of store and therefore customer slipped as result of "condition created by the activity").

In the case before us, the record contains no evidence that Olivares was injured by or as a contemporaneous result of any activity of Multi-Building. *See Timberwalk*, 972 S.W.2d at 753; *Keetch*, 845 S.W.2d at 264. However, there was some evidence that Olivares was injured by a condition created on the premises, i.e., the joist that "wasn't nailed down or wasn't firm." *See Timberwalk*, 972 S.W.2d at 753; *Keetch*, 845 S.W.2d at 264. Therefore, we conclude the trial court correctly charged the jury as to premises liability and properly refused Olivares's request to charge the jury as to "straight negligence" of Multi-Building. *See Timberwalk*, 972 S.W.2d at 753; *Keetch*,

845 S.W.2d at 264; *see also Park N. Serv. Ctr.*, 338 S.W.3d at 721; TEX. R. CIV. P. 278.

We decide against Olivares on his second and third issues.

### 2. Exclusion of Subcontract

Next, we address Olivares's first issue, in which he contends the trial court reversibly erred by excluding the subcontract from evidence "where that subcontract demonstrated Multi-Building's responsibility for the work and work place and prohibited Multi-Building from passing its responsibility on to a sub-subcontractor like Alfonso Mares." Olivares argues the subcontract was "highly relevant to and probative of the issues presented in this suit." Further, Olivares contends the trial court's error in excluding the subcontract "probably caused the rendition of an improper judgment."

Multi-Building argues, in part, (1) Olivares has failed to properly preserve this complaint because he never offered the subcontract into evidence at trial; (2) the subcontract "was not relevant to establish the necessary right to control the manner, means, or methods of the specific activity which caused [Olivares's] injury as required by applicable law to create a duty flowing from Multi-Building to [Olivares]"; and (3) "the absence of the subcontract from evidence was harmless since it is not controlling on the issue of control, and the jury found that Multi-Building had the right to control the work anyway."

Assuming without deciding that Olivares properly preserved this complaint for appellate review, we cannot agree with Olivares that the record shows he was harmed by the error alleged. *See* TEX. R. APP. P. 44.1(a). Olivares contends the subcontract was "not cumulative" and was controlling as to (1) "Multi-Building's retention of the right to control the details of the work" and (2) "the jury's apportionment of fault among the parties." However, the record shows the jury found in response to question number one of the charge of the court that Multi-Building "exercise[d] or

–15–

retain[ed] some control over the manner in which the injury causing activity was performed."

Therefore, we cannot agree with Olivares that the exclusion of the subcontract was harmful to him

respecting the issue of "Multi-Building's retention of the right to control the details of the work."

*See Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. Further, with respect to the jury's

"apportionment of fault among the parties," Olivares argues in his brief in this Court

> Based on scant evidence, the jury found that Multi-Building was 25% responsible for the injuries [Olivares] sustained. Thus, the jury believed that Multi-Building was somewhat responsible for the events in which Olivares was injured. . . .
> The only logical conclusion is that if the jury had been allowed to learn of Multi-Building's voluntary assumption of responsibility for the work done by Olivares and had Olivares been allowed to explore this voluntary assumption through testimony and argument, the jury's appraisal of Multi-Building's responsibility would have dramatically increased. Stated otherwise, as a result of the exclusion of this evidence, the jury's apportionment of liability to Multi-Building and the Trial Court's judgment based on that apportionment is in all logic and common sense, grossly understated in comparison to what it would be were the subcontract effectively presented to the jury for its consideration.

The record does not show the "testimony and argument" through which Olivares planned to "explore

this voluntary assumption." Nor does the record show the trial court was made aware of the

apportionment issue about which Olivares complains. *See* TEX. R. APP. P. 33.1(a); *cf. Wackenhut*

*Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 621 (Tex. App.—Corpus Christi 2009, no pet.)

(where party objected to liability questions in jury charge, but did not make trial court aware of

complaint as to apportionment question, party "failed to preserve its complaint and has failed to

show harm" as to apportionment). Moreover, while Olivares asserts the jury's appraisal of Multi-

Building's responsibility would have "dramatically increased" if the subcontract had been admitted,

he does not explain, or provide citation to the record for, the specific bases for such an increase or

describe how the jury's calculation would change. Consequently, we cannot conclude Olivares has

shown harm as to the jury's "apportionment of fault." *See Muhs v. Whataburger, Inc.*, No. 13-09-

00434-CV, 2010 WL 4657955, at *8 (Tex. App.—Corpus Christi Nov. 18, 2010, pet. denied) (mem.

op.) (although plaintiff contended apportionment of liability would have changed if excluded evidence had been admitted, no harm was shown where plaintiff "fail[ed] to explain how the jury's proportionate responsibility calculations would change"); *see also* TEX. R. APP. P. 38.1(i) (appellant's brief must contain clear argument for contentions made, with appropriate citations to authorities and record).

We decide Olivares's first issue against him.

### 3. Granting of Judgment Notwithstanding the Verdict as to Past Lost Wages

In his fourth issue, Olivares asserts the trial court reversibly erred by reducing the jury's award of past lost income on Multi-Building's motion for judgment notwithstanding the verdict when there was some evidence to support the amount awarded by the jury. According to Olivares, "there is testimony that supports the amount awarded by the jury" and "[t]hat testimony cannot be disregarded in favor of the ambiguous testimony relied on by Multi-Building to urge that the award be reduced."

Multi-Building asserts the trial court correctly reduced the amount awarded to Olivares for past lost wages "based upon his own undisputed testimony."

As described above, the record shows Olivares testified his past lost wages total $72,000. Further, he testified he is currently selling clothes and making about forty percent of the income he "had made in the past." However, Olivares argues

> [T]he time frame "in the past" is not described or identified. That is, there is nothing to indicate that the "in the past" refers to the period when he worked with Mr. Mares. Thus, this evidence does not support the conclusion that [Olivares] had been earning 40% of the income he was earning at time of his injury (in fact, given that [Olivares] had also testified that he had his own business selling clothes for approximately 10 to 12 years before he "came here" in 2003, it is just as reasonable to assume that he had this period in mind when he answered the question regarding how much he was earning on his business selling clothes currently—that is, his answer in full would be "[selling clothes he is] making about 40 percent of the income that [he] had made in the past [selling clothes]").

–17–

(citations to record omitted). The record does not show Olivares asserted this particular argument set out above in the trial court. *See* TEX. R. APP. P. 33.1(a). Moreover, the record shows the specific testimony quoted directly above respecting Oilvares's "business selling clothes" includes references by him to numerous jobs he has held throughout his life.[5] Additionally, the testimony that uses the phrase "in the past" appears more than forty pages after Olivares's testimony respecting his pre-2003 "business selling clothes." Finally, the phrase "in the past" was included in a question posed by Multi-Building's counsel which, read in context, asked Olivares to compare his lost wages claim of $72,000 with his current income from selling clothes. We cannot conclude the record shows that "in the past" refers to any time period other than the time of Olivares's injury. Accordingly, we conclude the trial court did not err by reducing the jury's award of past lost income.

---

[5] The testimony cited by Olivares on appeal respecting his "business selling clothes" reads as follows:

Q. Now, what type of work have you done most of your life?

A. Well, in Monterrey up until I was 31 years old, I worked in construction as a carpenter.

. . . .

Q. Anything else?

A. Well, that was until I was 32. And then I went to work at a factory as a watchman for 14 years.

Q. All right. So for 32 years you were in the construction business as a carpenter; then, thereafter, for 14 years you were a watchman?

A. I didn't work for 32 years. I worked until I was 32. From 18 to 32 in construction as a carpenter.

Q. And thereafter you were a watchman for 14 years?

A. That's right.

Q. All right. How old were you when you stopped doing the watchman work?

A. Forty-four years old.

Q. And then what type of work did you do?

A. Business.

Q. Okay. What type?

A. I sold clothing.

Q. From the age of 44 until when?

A. Well, I still do that, but, like, until I came here in 2003.

We decide against Olivares on his fourth issue.

### III. MULTI-BUILDING'S "CROSS-POINTS"

In its two "cross-points," Multi-Building contends that if the trial court's reduction of the jury's award of past lost wages was error, (1) the trial court erred by not granting judgment notwithstanding the verdict "that [Olivares] take nothing on his claims against Multi-Building" and (2) the evidence was legally and factually insufficient to support an award of past lost wages to Olivares. During oral argument in this Court, appellant contended that because Multi-Building did not file a notice of appeal in this case, its "cross-points" are not properly before this Court.

Rule of appellate procedure 25.1 provides in relevant part that "[t]he appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." TEX. R. APP. P. 25.1(c). Rule of appellate procedure 38.2 states, in part,

> When the trial court renders judgment notwithstanding the verdict on one or more questions, the appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict. Failure to bring forward by cross-point an issue or point that would vitiate the verdict or prevent an affirmance of the judgment waives that complaint. Included in this requirement is a point that:
> (A) the verdict or one or more jury findings have insufficient evidentiary support or are against the overwhelming preponderance of the evidence as a matter of fact; or
> (B) the verdict should be set aside because of improper argument of counsel.

TEX. R. APP. P. 38.2(b)(1); *see* TEX. R. CIV. P. 324(c).

During oral argument in this Court, Multi-Building contended it was not required to file a notice of appeal to assert the complaints in question in this Court because "cross-points" pursuant to rule 38.2(b)(1) can properly include requests for relief more favorable than that granted in the trial court. Multi-Building cited no authority, and we have found none, to support that position. *Cf.*

*Helton v. R.R. Comm'n*, 126 S.W.3d 111, 119–20 (Tex. App.—Houston [1st Dist.] 2003, pet.

denied) (noting distinction between cross-points that require separate notice of appeal and claims that merely seek to raise alternate grounds opposing recovery by appealing party); TEX. R. APP. P. 25.1(c). Moreover, as described above, we did not conclude "the trial court's reduction of the jury's award of past lost wages was error." Therefore, Multi-Building's "cross-points," which were specifically conditioned on a such a conclusion of error, are moot. *See In re Estate of Clifton*, No. 13-11-00462-CV, 2012 WL 3139864, at *8 n.9 (Tex. App.—Corpus Christi Aug. 2, 2012, no pet.) (mem. op.) ("cross-point" of appellee that was conditioned on appellate court's reversal of trial court's JNOV was "moot" where appellate court concluded trial court's JNOV was not erroneous); *Underwriters at Lloyd's of London v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 05-96-00081-CV, 1997 WL 714282, at * 7 (Tex. App.—Dallas Nov. 17, 1997, no pet.) (not designated for publication) (cross-point denied as "moot" where it was conditioned on reversal of trial court's judgment and such judgment was affirmed by appellate court). Accordingly, we decide against Multi-Building on its two "cross-points."

## IV. CONCLUSION

We decide Olivares's four issues against him. Additionally, we decide against Multi-Building on its two "cross-points."

The trial court's judgment is affirmed.

DOUGLAS S. LANG
JUSTICE

101486F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

EMILIO OLIVARES, Appellant

No. 05-10-01486-CV          V.

ALFONSO MARES AND MULTI-
BUILDING, INC., Appellees

Appeal from the County Court at Law No. 3
of Dallas County, Texas. (Tr.Ct.No. CC-06-
01800-C).
Opinion delivered by Justice Lang, Justices
Bridges and Richter participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. It is **ORDERED** that appellees Alfonso Mares and Multi-Building, Inc. recover their costs of this appeal from appellant Emilio Olivares.

Judgment entered November 27, 2012.

DOUGLAS S. LANG
JUSTICE